**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**Brian STOKER, Defendant.**

**No. 11 Civ. 7388(JSR).**

United States District Court,
S.D. New York.

July 9, 2012.

Andrew H. Feller, Jane Margaret Ellen Peterson, Jeffrey Thomas Infelise, Richard Edward Simpson, Securities and Exchange Commission, Washington, DC, for Plaintiff.

Brook Dooley, Caitlin Bales Noel, Daniel W. Gordon, Jan Nielsen Little, John W. Keker, Matan Shacham, Steven K. Taylor, San Francisco, CA, for Defendant.

## MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

In this securities fraud action, the SEC alleges that defendant Brian Stoker negligently violated Section 17(a)(2) & (3) of the Securities Act of 1933, 15 U.S.C. 77q(a)(2) & (3), in connection with his role in structuring and marketing a largely synthetic collateralized debt obligation ("CDO") called Class V Funding III ("the Fund"). Stoker now moves for summary judgment on both counts of the Complaint. After full consideration of the parties' submissions, the Court denies the motion in its entirety.

The pertinent facts of record, either undisputed or, where disputed, taken most favorably to the plaintiff, are described below.

By way of background, as this Court explained in its prior opinion denying Stoker's motion to dismiss:

> CDOs are debt securities collateralized by fixed income obligations, such as residential mortgage-backed securities. A CDO collateralized by other CDOs is called a "CDO squared." One such CDO squared portfolio was a fund called "Class V III" (the "Fund"). Under the terms of the Fund and similar instruments, a 'protection buyer' makes periodic premium payments to a 'protection seller.' In return, the protection seller agrees to pay the protection buyer if the CDO experiences a default. Piercing through the jargon, the protection seller is effectively taking a long position on the CDO, while the protection buyer is effectively taking a short position.

*S.E.C. v. Stoker*, 11 Civ. 7388, 865 F.Supp.2d 457, 459, 2012 WL 2017736, at *2 (S.D.N.Y. June 6, 2012) (citations omitted).

By late October 2006, Citigroup's CDO trading desk had a large number of hedge fund customers seeking to buy protection on CDO tranches, particularly on mezzanine CDOs originated in 2006. *See, e.g.,* Plaintiff's Memorandum of Law in Opposition to Defendant Brian H. Stoker's Motion for Summary Judgment ("Pl. Mem."), Ex. 23, Emails between James Prusko and Donald J. Quintin, Sept. 13, 2006 ("Prusko–Quintin Emails").[1] Citigroup knew that there was significant demand from these hedge funds to short CDOs that were part of a series of transactions named after constellations (the "Constella-

---

**1.** The SEC has (somewhat improperly) included its exhibits as attachments to its Memorandum of Law, rather than as exhibits to a separate declaration. Therefore, this Opinion will refer to those exhibits as "Pl. Mem. Ex.—."

tion CDOs"). *See id.* As early as September 2006, Citigroup also knew that the default rate in a CDO squared could double if as little as five or ten percent of the CDO assets included in it were "weak." Pl. Mem. Ex. 22. As Citigroup was structuring the Fund, it was also aware that the performance of CDOs containing subprime mortgages—especially those originated in 2006—was deteriorating. *See,* e.g., Pl. Mem. Ex. 47.

Stoker was a director on the structuring desk of Citigroup's CDO Group (the "CDO Group"). Pl. Mem. Ex. 15, Deposition of Brian Stoker, May 3, 2012 ("Stoker Dep.") at 10:11–11:2. Stoker was the lead structurer or "deal manager" of the Fund. Pl. Mem. Ex. 14, Investigative Testimony of Brian Stoker, Mar. 4, 2010 ("Stoker Investigative Test.") at 199:10–11.

As a result of the increased demand to purchase protection on CDOs, the CDO Group had internal discussions about the possibility of creating a CDO squared collateralized by some of the riskier CDOs. See, e.g., Pl. Mem. Ex. 33. On October 19, 2006, Citigroup initiated discussions with Credit Suisse Alternative Capital ("CSAC") about CSAC acting as collateral manager for the proposed CDO squared. Pl. Mem. Ex. 28. Citigroup knew that representing to investors that an experienced, third-party collateral manager had selected the investment portfolio would facilitate the placement of the CDO squared's liabilities. *See, e.g.,* Pl. Mem. Ex. 8, Deposition of Shalabh Merish, Mar. 2, 2012 ("Merish Dep.") at 38:24–39:14.

Beginning in October 2006, personnel from Citigroup's CDO trading desk, including Donald Quintin, the Managing Director of the CDO Group's secondary trading desk, discussed with Stoker and others on the CDO Group's structuring desk the possibility that Citigroup would take short positions on a specific group of CDOs, including several Constellation deals. *See,* e.g., Pl. Mem. Exs. 42, 43, 62; Stoker. Dep. at 49:3–50:17.

In October 2006, Quintin asked Stoker to structure a CDO that Quintin would use to execute a proprietary trade.[2] Stoker Dep. at 49:3–17. On October 23, 2006, Quintin sent Stoker a list of 21 assets on which he wished to purchase protection. Pl. Mem. Ex. 29. Twelve of the assets on this list were Constellation deals. Pl. Mem. Ex. 21, Expert Witness Report of Jonathan A. Neuberger, Ph.D., Mar. 16, 2012 ("Neuberger Rep.") ¶ 57. Stoker prepared and distributed models showing the potential profits for Citigroup from shorting assets into the Fund. Pl. Mem. Ex. 31.

On November 1, 2006, Stoker forwarded the list of assets he received from Quintin to Sohail Khan, the sales person at Citigroup who dealt with CSAC. Pl. Mem. Ex. 36. Stoker did not normally send a list of potential assets for inclusion in a deal to a sales person at Citigroup, *see* Stoker Investigative Test. at 47:18–24, and he did not normally suggest specific assets for inclusion in a CDO he was structuring, Stoker Dep. at 73:6–19. Khan, with Stoker's knowledge, forwarded the list he received from Stoker, along with the names of four other assets, to CSAC. Pl. Mem. Ex. 35. The next day, Quintin told Stoker that CSAC was "amenable to the portfolio." Pl. Mem. Ex. 37. That same day, Stoker distributed a draft engagement letter for a CDO squared with CSAC. Pl. Mem. Ex. 38, Emails between Brian Stoker and Darius Grant, Nov. 3, 2006 ("Stoker–Grant Emails").

---

**2.** A proprietary trade is a trade undertaken for a firm's own account, rather than on behalf of the firm's customers. *Stoker,* 865 F.Supp.2d at 459, 2012 WL 2017736, at \*2.

On November 3, 2006, in response to an inquiry from Darius Grant, Stoker's supervisor, about whether the proposed CDO would go forward, Stoker replied: "I hope so. This is [Quintin's] prop trade (don't tell CSAC). CSAC agreed to terms even though they don't get to pick the assets." Stoker–Grant Emails. On November 22, 2006, Stoker distributed "the latest structure" of the Fund. Pl. Mem. Ex. 41. Stoker's recommended structure included a number of Constellation deals. *Id.*

In December 2006, CSAC and Citigroup agreed to go forward with the Fund. On December 21, 2006, CSAC sent a list to Citigroup employees, including Stoker, of approximately 127 CDOs as potential candidates for inclusion in the Fund. Pl. Mem. Ex. 46. This list of assets included 20 of the 25 assets that Citigroup sent to CSAC on November 1, 2006, including fifteen Constellation deals. Declaration of Brook Dooley, May 7, 2012 ("Dooley Decl."), Ex. 22, Expert Report of Robert M. MacLaverty, Mar. 16, 2016 ("MacLaverty Rep.") Ex. 2A; Neuberger Rep. ¶ 56.

On January 8, 2007, Citigroup selected 25 CDOs from the list of potential assets on which it wanted to purchase protection. Pl. Mem. Ex. 48.[3] Within an hour of receiving Citigroup's list of 25 assets, CSAC agreed to include those 25 CDOs in the Fund. Pl. Mem. Ex. 50. Twelve of these 25 CDOs were Constellation deals. Neuberger Rep. ¶ 57. All but one of the 25 assets that Citigroup selected for the Fund were CDOs that originated in 2006. *Id.* ¶ 67. Citigroup, with Stoker's knowledge,

purchased $250 million of protection on these assets. Pl. Mem. Ex. 51; Stoker. Dep. at 104:5–105:7.

In addition to the twenty-five synthetic assets that Citigroup had sent to CSAC for inclusion in the Fund, the Fund also contained twenty-four synthetic assets that Citigroup did not select. Pl. Mem. Ex. 18, Expert Witness Report of Dwight M. Jaffee, Ph.D., Mar. 16, 2002 ("Jaffee Rep.") ¶ 42. Citigroup served as the intermediary for the twenty-four assets that it had not selected, but it sold its position on all but one of these assets before the Fund closed; the vast majority of these sales took place on the same day that Citigroup became the intermediary. Pl. Mem. Ex. 94.[4] This was consistent with the way that Stoker viewed Citigroup's normal role as an initial swap counterparty: for those assets that Citigroup did not select, Citigroup was simply an "intermediary . . . moving money around." Stoker Investigative Test. at 63:5–9. By contrast, Stoker understood that if Citigroup picked synthetic assets for inclusion in a CDO for the purpose of purchasing protection on those assets, it was likely that Citigroup wanted those assets to perform poorly. Stoker Dep. at 151:11–152:18. On January 12, 2007, Citigroup and CSAC agreed that Citigroup would double its investment in the Fund by doubling the amount that it had shorted each of the 25 assets. Pl. Mem. Ex. 104. Ultimately, Citigroup took a nearly $500 million naked short position on the 25 assets.[5]

---

**3.** Sixteen of these twenty-five assets were on the original list that Citigroup had sent to CSAC in November of 2006. MacLaverty Rep. ¶ 25.

**4.** Stoker objects to this exhibit, arguing that it contains improper summary charts and untimely and improper expert testimony. The Court need not reach these objections at this

stage, because with or without this exhibit, the SEC has presented sufficient evidence to defeat Stoker's motion for summary judgment.

**5.** A "naked short position" is a short position that has not been hedged or covered. Pl. Mem. Ex. 20 at ¶ 11.

Citigroup's primary marketing materials for the Fund consisted of a pitch book and an offering circular (collectively the "Marketing Materials"). *See* Pl. Mem. Ex. 84 ("Pitch Book"); Pl. Mem. Ex. 85 ("Offering Circular").[6] Both documents were adapted from documents used by Citigroup for earlier transactions.

The Transaction Overview of the Pitch Book stated that CSAC was the "Manager" of the Fund and that CSAC had selected the collateral for the Fund. Pitch Book at 09570339. The Manager Section, a 20-page section originally provided by CSAC, included a detailed, ninepage section titled "Portfolio Construction and Management," which described CSAC's purportedly rigorous approach to selecting each asset it included in the investment portfolio of its CDOs. *Id.* at 09570351–61. Page 88 of Offering Circular included a generic disclosure that stated that Citigroup "may provide CDS Assets as an intermediary with matching off-setting positions requested by [Credit Suisse] or may provide CDS Assets alone without any offsetting positions." Offering Circular at 09572393.

The Marketing Materials did not mention, however, that Citigroup already had a $500 million short position on the collateral, or that the Fund was structured as a "prop trade," whose purpose was to allow Citigroup to short the assets for its own account. The Marketing Materials also did not disclose Citigroup's role in selecting the assets for the Fund. Nor did the Marketing Materials disclose that Citigroup's proprietary short position was comprised of the CDOs it had been allowed to select, and that Citigroup had not shorted those CDOs that it had no role in selecting. *See id.* In addition, the Offering Circular repeatedly stated that the investment portfolio had been "selected" by CSAC. *See, e.g., id.* at 45174, 45179, 45260.

Stoker personally made substantial edits to the Offering Circular. *See* Pl. Mem. Ex. 68 at 18416633–69; Pl. Mem. Ex. 69. However, he made no changes to the sections stating CSAC selected the assets or to the section describing Citigroup's position as initial swap counter-party. *See* Pl. Mem. Ex. 69; Stoker Dep. at 44:10–23. On February 6, 2007 Stoker personally sent a copy of the Pitch Book to a prospective investor, along with a note that stated, "Here's a top-of-the-line CDO squared for you." Pl. Mem. Ex. 60, Email from Brian Stoker to Princeton Advisory, Feb. 6, 2007 ("Stoker–Princeton Advisory Email"). Stoker also sent a copy of the Offering Circular to Ambac Financial Group ("Ambac"). Pl. Mem. Ex. 63. Ambac was the largest investor in the Fund.

On November 19, 2007, the Fund was declared to be in an Event of Default. Pl. Mem. Ex. 40. On the date that the Fund was declared to be in default, six of the 25 assets selected by Citigroup were declared in default, while only two of the 102 other assets proposed by CSAC were declared in default. Neuberger Rep. ¶ 77. This difference in default rates is statistically significant. *Id.* As a result of the default of the Fund and the performance of the Fund's underlying collateral, Ambac alone suffered losses of about $305 million. Pl. Mem. Ex. 87. Citigroup received approximately $34 million from investors as fees for structuring the Fund. Pl. Mem. Ex. 74. In addition, as a result of the short position Citigroup took on the 25 assets it pushed CSAC to include in the Fund, Citigroup made a profit of at least $250 mil-

---

6. The Offering Circular was similar to a prospectus, while the pitch book was a PowerPoint presentation used to pitch the Fund to potential investors. *Stoker,* 865 F.Supp.2d at 461, 2012 WL 2017736, at *3.

lion. Pl. Mem. Ex. 78; Stoker Dep. at 141:4–7.

Against this factual background, the Court turns to the pending motion for summary judgment. Under Federal Rule of Civil Procedure 56(a), a party seeking summary judgment must demonstrate that there is "no genuine dispute as to any material fact" and that the party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The SEC charges Stoker with violations of the antifraud section of the 1933 Act, § 17(a), which makes it:

> unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which oper-

ates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

■ As this Court stated in its opinion denying Stoker's motion to dismiss, the SEC, in order to prevail at trial on the claim under Section 17(a)(2), must prove that Stoker, while acting as Citigroup's agent, obtained money or property for Citigroup by use of a false or misleading statement or omission, whether prepared by himself or by another. *Stoker,* 865 F.Supp.2d at 462, 464–65, 2012 WL 2017736, at *5, *7.

The Court will first address the question of whether the Marketing Materials contained material misstatements or omissions. If there is a genuine factual dispute on that question, the next question is whether Stoker obtained money or property for Citigroup by use of those statements or omissions. If there is a genuine factual dispute on that question as well, Stoker's summary judgment motion must be denied as to the claim under Section 17(a)(2).

■ Here, the SEC has raised a triable issue that the Marketing Materials contained both material misstatements and material omissions. As to omissions, the SEC has adduced competent evidence that Citigroup, in not informing investors of the role that Citigroup played in selecting the assets or the fact that it had already taken a $500 million short position in only those assets it had helped to select, created material misimpressions.[7] As to affirmative misrepresentations, the SEC has adduced competent evidence that the Marketing Materials' repeated references to CSAC's selecting the assets for the Fund was a material misstatement, given Citigroup's

---

7. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly al-

tered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

important role in selecting the 25 synthetic assets on which Citigroup took a short position.[8] In fact, when Grant inquired about whether the proposed CDO would go forward, Stoker replied: "I hope so. This is [ Quintin's] prop trade (don't tell CSAC). CSAC agreed to terms *even though they don't get to pick the assets.*" Stoker–Grant Emails (emphasis added). Stoker argues that he wrote this email over two months before CSAC and Citigroup signed the engagement letter and almost four months before the Fund closed, *see* Reply Memorandum in Support of Defendant Brian H. Stoker's Motion for Summary Judgment ("Def. Reply Mem.") at 5, but this email from Stoker alone is sufficient to raise a genuine dispute about which entity selected the assets.

Moreover, that email does not stand alone. Citigroup sent CSAC a list of twenty-five names for potential inclusion in the Fund, and CSAC included 20 of those names in its list of 127 possible assets. MacLaverty Rep. at Ex. 2A. Then, Citigroup selected 25 CDOs from CSAC's list on which it wanted to purchase protection. Pl. Mem. Ex. 48. Sixteen of those assets were on the original list that Citigroup sent to CSAC. MacLaverty Rep. ¶ 25. After Citigroup selected those 25 assets, it took CSAC only one hour to approve those assets for inclusion in the deal. Pl. Mem. Ex. 50. In combination with Stoker's email, this is sufficient evidence of Citigroup's role in selecting assets for the Fund to raise a jury question on this issue.

Stoker argues that any misstatements or omissions were not material because it is

undisputed that "an arranging bank and a collateral manager may have discussions regarding the selection of assets for a CDO." *See* Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 in Support of Defendant Brian H. Stoker's Motion for Summary Judgment ("Def. 56.1") ¶ 16; Plaintiff's Counter–Statement of Undisputed Material Facts ("Pl. 56.1") ¶ 16. The SEC also concedes that an "arranging bank could have input concerning assets to be included in a CDO and whether the arranging bank believed it had 'the ability to source particular assets for the CDO.'" Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17. But, there is a genuine dispute of material fact regarding whether Citigroup's involvement in the selection of the assets for the Fund was unusual enough to merit different disclosures from those required for a traditional CDO. Stoker did not normally send a list of potential assets for inclusion in a deal to a sales person at Citigroup, Stoker Investigative Test. at 47:18–24, and he did not normally suggest specific assets for inclusion in a CDO he was structuring, Stoker Dep. at 73:6–19. Stoker himself said that CSAC did not get to select the assets. Stoker–Grant Emails. Meanwhile, Ambac believed that CSAC had carefully evaluated the potential assets in the Fund and made selections in its role as manager. Pl. Mem. Ex. 12, Investigative Testimony of David Salz, June 28, 2010 ("Salz Investigative Test.") at 250:5–25. Indeed, Citigroup knew that representing to investors that an experienced, third-party collateral manager had selected the investment portfolio would facilitate the

---

**8.** The fact that one of the SEC's expert witnesses only identified omissions in the Marketing Materials, rather than misstatements, is not dispositive at this stage. The expert is not a 30(b)(6) witness, and the SEC is not bound by his testimony. There is more than enough evidence to raise a genuine dispute of material fact as to both misstatements and omissions. In the context of this motion, moreover, the distinction between a statement that is a misrepresentation because it is in some respect false and an omission that is actionable because its inclusion would be necessary to make what is stated not misleading is too fine a distinction to be material to the resolution of the motion.

placement of the CDO squared's liabilities. *See, e.g.,* Pl. Mem. Ex. 8, Deposition of Shalabh Merish, Mar. 2, 2012 ("Merish Dep.") at 38:24–39:14. If Ambac had known that Citigroup had taken a $500 million naked short position on the 25 assets Citigroup had selected for inclusion in the Fund, but not on any of the other assets in the Fund, Ambac would have considered "walk[ing] away from the transaction." Salz Investigative Test. at 248:13–249:6.

In addition, there is a genuine dispute as to whether the Offering Circular was misleading in stating that Citigroup *"may* provide CDS Assets alone without any offsetting positions," Offering Circular at 88, even though Citigroup had already taken a $500 million naked short position in those assets. Stoker argues that this statement was not misleading because "Citigroup's trading desk had no intention to maintain its short positions in these 25 assets for any defined period of time." Memorandum of Points and Authorities in Support of Defendant Brian H. Stoker's Motion for Summary Judgment ("Def. Mem.") at 15. But, there is a genuine dispute as to whether Citigroup intended to maintain the short positions. In fact, Quintin had told colleagues at Citigroup that given the then-current "market conditions," he intended to retain Citigroup's short position in the assets it selected, even if Citigroup sold all the tranches of the Fund. *See, e.g.,* Pl. Mem. Ex. 70. Because of the excess risk this position created, Quintin sought and received from Citigroup's Independent Risk Group a three-month exception to risk limitations. Pl. Mem. Ex. 100.

Having determined that there is a genuine dispute as to whether the Marketing Materials contained materially misleading statements and material omissions, the next question is whether Stoker, while acting as Citigroup's agent, used those statements or omissions to obtain money or property for Citigroup. As this Court previously held, Stoker need not have prepared the relevant statements himself—he must simply have used them, whether they were prepared by himself or another. *Stoker,* 865 F.Supp.2d at 464–65, 2012 WL 2017736, at *7.

Stoker was the lead structurer or "deal manager" on the Fund. Pl. Mem. Ex. 14 at 199:10–11. Although Stoker knew, or should have known (the charge here is negligence), that the Marketing Materials contained misstatements or omissions, Stoker personally sent a copy of the Pitch Book to a prospective investor, along with a note that stated, "Here's a top-of-the-line CDO squared for you." Stoker Princeton Advisory Email. Stoker also sent a copy of the Offering Circular to Ambac Financial Group ("Ambac"). Pl. Mem. Ex. 63.

Even assuming *arguendo* that that alone were insufficient to find that Stoker used the misstatements or omissions, Stoker also had significant responsibility for the Marketing Materials, and thus there is a jury question as to whether Stoker's role in preparing those Marketing Materials for distribution, in combination with his actual distribution of those materials, was sufficient to qualify as "using" the statements for purposes of liability under Section 17(a)(2). Stoker knew that the statements would be disseminated to investors, because the statements were made in the Marketing Materials specifically prepared to send to investors to encourage them to invest in the Fund. Stoker edited portions of the Marketing Materials, determined what should be included in those materials, and was responsible for transmitting certain information about the deal to outside deal counsel.

Although Stoker protests that several individuals and entities participated in the drafting of the Marketing Materials, Def.

Mem. at 8, that outside counsel was primarily responsible for the Offering Circular, and that to the extent Stoker was responsible for the Pitch Book, he was responsible for compiling it and not for its content, Def. Reply Mem. at 4, there are at best jury arguments insufficient to prevail on summary judgment. Indeed, the fact that Stoker was one of several people working on the Marketing Materials is irrelevant, because Stoker is liable as long as he used the statements, whether prepared by himself of another. Moreover, Stoker testified that he was responsible for reviewing the Pitch Book for accuracy and approving it before distribution. Stoker Investigative Test. at 126:15–127:10. In addition, as deal manager for the Fund, Stoker was responsible for providing information to outside counsel for inclusion in the Offering Circular, and he was responsible for providing counsel with information regarding differences between the Fund and other CDOs that would affect the standard provisions used in offering circulars. Pl. Mem. Ex. 5, Deposition of Darius Grant, Mar. 6, 2012 ("Grant Dep.") at 140:8–23. Stoker, in fact, testified that he was responsible for informing outside counsel if he knew something in the Offering Circular was inaccurate or if he was aware of "something interesting" about the CDO. Stoker Dep. at 28:20–29:12; *see also* Stoker Investigative Test. at 288:9–290:2. Although Stoker knew, or should have known, that the Marketing Materials did not disclose Citigroup's role in selecting assets or that it already had a $500 million naked short position on those assets it had helped to select, he did not disclose that information to outside counsel, and he did not correct that information himself. Accordingly, there is a genuine dispute about whether Stoker "used" the statements in the Marketing Materials.

There is also sufficient evidence for a jury to find that Stoker, acting as Citigroup's agent, obtained money or property for Citigroup by means of the misstatements and omissions. If Ambac had been apprised of the true nature of the transaction, it would have considered walking away from the transaction. Salz Investigative Test. at 248:13–249:6. Without the participation of Ambac and the other investors, Citigroup would not have made $34 million in fees and $250 million in profits on the Fund.

■ Turning now to the claim under Section 17(a)(3), that section prohibits a defendant from engaging "in any transaction, practice, or course of business which operates ... as a fraud or deceit upon the purchaser" of any security. 15 U.S.C. § 77q(a)(3). Although Stoker argues that the Section 17(a)(3) claim is duplicative of the Section 17(a)(2) claim, "a defendant may be liable under both Section 17(a)(2) and Section 17(a)(3) based on allegations stemming from the same set of facts as long as the SEC [proves] that the defendant[ ] 'undertook a deceptive scheme or course of conduct that went beyond the misrepresentations.' " *Stoker*, 865 F.Supp.2d at 467, 2012 WL 2017736, at *10 (quoting *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 475 (S.D.N.Y.2005)). There is certainly a jury question as to whether the course of conduct here went beyond the misrepresentations discussed above.

The SEC asserts that the Fund "was intended as a means for Citigroup to position itself to profit if there was a downturn in the housing market." Pl. Mem. at 25. Stoker argues that this assertion is inconsistent with the SEC's failure to charge scienter, but "these allegations may also be read to allege that Stoker was at least negligent, and there is no further scienter required under Section 17(a)." *Stoker*, 865

F.Supp.2d at 468 n. 12, 2012 WL 2017736, at *11 n. 12.

Stoker also argues that "the SEC presents no evidence that Citigroup or Mr. Stoker had a view about the likely performance of" the Fund's assets. Def. Reply Mem. at 10. But, there is ample evidence to suggest that Citigroup and Stoker believed that the assets would perform poorly. In fact, the Fund was created as a proprietary trade at least in part so that Citigroup could short CDOs for its own account. Stoker understood that if Citigroup picked synthetic assets for inclusion in a synthetic CDO for the purpose of purchasing protection on those assets, it was likely that Citigroup wanted those assets to perform poorly. Stoker Dep. at 151:11–152:18.

Before setting up the Fund, Citigroup knew that certain hedge funds were taking short positions on Constellation CDOs, and Citigroup sought to include as many of those CDOs as possible in the Fund.[9] Stoker himself recommended the inclusion of Constellation CDOs in the Fund. Pl. Mem. Ex. 41. According to one of the SEC's expert witnesses, the 25 assets that Citigroup selected and took naked short positions on were of a lower quality than the other assets in the Fund. Neuberger Rep. at ¶¶ 11, 53–73.

It is true that taking a proprietary short position in order to profit from the falling housing market is not itself evidence of fraud. But, there appears to be much more to the evidence here. The jury will decide whether there is sufficient evidence to prove that Citigroup and Stoker decided, intentionally or negligently, to design a

Fund to take advantage of the potential for a falling housing market, chose assets for inclusion in the Fund based at least in part on the fact that some market participants thought they would fail, and took a $500 million naked short position on those assets, all without disclosing that Citigroup 1) had designed the Fund as a proprietary trade, 2) chose certain assets, and 3) took a $500 million naked short position on only those assets.[10] If so, that would be more than sufficient for the SEC to prevail on this claim. In addition, as discussed above, Citigroup apparently engaged CSAC as a collateral manager because it knew that it would be difficult to move forward on the transaction unless investors thought the assets in the Fund were chosen by a reputable outside entity.

Stoker was actively involved in the discussions of which assets to include in the Fund and which assets to short; he prepared models showing the potential profits to Citigroup from shorting specific assets into the CDO squared. Stoker also knew that the Fund was designed as a proprietary trade, and he made sure that CSAC did not know about this arrangement by telling his supervisor not to tell CSAC that Citigroup had designed the Fund as a proprietary trade. Stoker also actively encouraged investors to invest in the Fund, even though he knew or should have known that the Citigroup was betting that the assets would fail and that the Marketing Materials did not disclose this fact. In the end, Citigroup induced CSAC to include 25 assets in the Fund, on which it took a $500 million short position. These assets performed significantly worse than

---

**9.** Stoker argues that the assets were chosen for their liquidity, not their likely performance, *see* Def. Mem. at 25, but this only serves to further illustrate that there is a genuine dispute of material fact on this issue.

**10.** Stoker also argues that Citigroup did not have an intention to maintain its short position on the 25 assets, Def. Mem. at 24, but as discussed above in the section on the Section 17(a)(2) claim, there is a genuine dispute of material fact on this issue.

the other assets in the Fund. There is, in short, sufficient evidence for a jury to find Stoker liable under Section 17(a)(3).

The Court has considered Stoker's other arguments and finds them without merit.[11] Accordingly, Stoker's motion for summary judgment is denied in its entirety.

SO ORDERED.

---

**11.** It is therefore not necessary to reach the SEC's alternative arguments in opposition to Stoker's motion for summary judgment.